# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

SCOTT H.,[1]

                      Plaintiff,

    v.

KILOLO KIJAKAZI,
Commissioner (Acting) of Soc. Sec. Admin.,

                  Defendant.

Case No. 3:20-cv-00226-SLG

## DECISION AND ORDER

On or about May 21, 2018,[2] Scott H. ("Plaintiff") protectively filed applications

for disability insurance benefits ("DIB") and supplemental security income ("SSI")

under Titles II and XVI of the Social Security Act ("the Act")[3] respectively.  In his

---

[1] Plaintiff's name is partially redacted pursuant to Fed. R. Civ. P. 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Administrative Record ("A.R.") 640, 657.  The application summaries list the application dates as May 22 and May 28, respectively.  A.R. 733, 735.  The Record appears to contain only the application summaries, not the applications themselves.  *Id.*

[3] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time.  Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income.  Plaintiff brought claims under Title II and Title XVI in this case.  Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs.  *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI).  For convenience, the Court cites the regulations governing

application, Plaintiff alleged disability beginning August 6, 2014.[4] Plaintiff has exhausted his administrative remedies and filed a Complaint on September 9, 2020, seeking relief from this Court.[5] Plaintiff's opening brief asks the Court to vacate and remand the agency's decision for an award of benefits or further proceedings and a new decision.[6] The Commissioner filed an Answer and a brief in opposition,[7] to which Plaintiff filed a reply brief.[8] Oral argument was not requested and was not necessary to the Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[9] For the reasons set forth below, Plaintiff's request for relief is granted.

## I.    STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or based upon legal error.[10] "Substantial evidence means such relevant evidence as a reasonable

---

disability determinations under both titles.

[4] A.R. 733, 735.

[5] Docket 1.

[6] Docket 25.

[7] Docket 20; Docket 26.

[8] Docket 27.

[9] 42 U.S.C. § 405(g).

[10] *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 2 of 50

mind might accept as adequate to support a conclusion. The evidence must be more than a mere scintilla, but may be less than a preponderance."[11]

In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[12] If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[13] A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which he did not rely."[14] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15]

//

//

---

[11] *Smith v. Kijakazi*, 14 F.4th 1108, 1111 (9th Cir. 2021) (quoting *Molina v. Astrue*, 674 F.3d 1104, 1110–11 (9th Cir. 2012)).

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

## II.    DETERMINING DISABILITY

The Social Security Act ("the Act") provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[16]  In addition, Supplemental Security Income ("SSI") may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[17]  The Act defines "disability" as:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[18]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[19]

---

[16] 42 U.S.C. § 423(a).

[17] 42 U.S.C. § 1381a.

[18] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[19] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner of the Social Security Administration ("SSA") has established a five-step process for determining disability within the meaning of the Act.[20] A claimant bears the burden of proof at Steps One through Four in order to make a prima facie showing of disability.[21] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at Step Five.[22] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[23] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity."[24] *The ALJ determined that Plaintiff had engaged in substantial gainful activity from August 6, 2014 to December 31, 2017 but had not engaged in any substantial gainful activity after December 31, 2017.*[25]

---

[20] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[21] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[22] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098.

[23] *Tackett*, 180 F.3d at 1101.

[24] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[25] A.R. 596–97.

**Step 2.** Determine whether the claimant has a medically determinable severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.[26] *The ALJ determined that Plaintiff had the following medically determinable severe impairments: degenerative joint disease and tendinitis in the bilateral wrists, degenerative disc disease in the cervical and lumbar spine, and obesity.*[27] *The ALJ also determined that Plaintiff's resected cavernoma and mental impairments were not severe impairments.*[28]

**Step 3.** Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. Part 404, Subpart P, App. 1, precluding substantial gainful activity. If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step.[29] *The ALJ determined that Plaintiff*

---

[26] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[27] A.R. 597.

[28] *Id.* at 598–600.

[29] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

*did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.*[30]

If a claimant's impairment or combination of impairments do not meet or equal a listed impairment, the claimant's residual functional capacity ("RFC") is assessed before going from Step Three to Step Four. Once determined, the RFC is used at both Step Four and Step Five. An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments that are not severe.[31] *The ALJ determined the Plaintiff had the residual functional capacity to perform light work with the following limitations: Plaintiff can frequently push and pull with bilateral upper extremities; can frequently stoop, but can never climb ladders, ropes, or scaffolds; can frequently handle and finger with the bilateral upper extremities; should avoid concentrated exposure to moving or hazardous machinery and unprotected heights; and should avoid moderate exposure to excessive vibration.*[32]

**Step 4.** Determine whether the claimant is capable of performing past relevant work. The ALJ makes this determination by comparing the claimant's

---

[30] A.R. 600.

[31] *20 C.F.R. §§ 404.1520(a)(4) & (e); 416.920(a)(4) & (e).*

[32] A.R. 601.

RFC with the "physical and mental demands" of his past work,[33] either as actually performed by the claimant in a past job or as generally performed in the national economy.[34]  If the claimant can perform such past relevant work, the claimant is deemed not to be disabled.[35]  Otherwise, the evaluation process moves to the fifth and final step.  *The ALJ determined Plaintiff was capable of performing past relevant work as a medical equipment service technician as generally performed, after finding that that position did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.*[36]

**Step 5.**  Determine whether the claimant is able to perform other work in the national economy in view of his age, education, and work experience, and in light of the RFC.  If so, the claimant is not disabled.  If not, the claimant is considered

---

[33] 20 C.F.R. §§ 404.1520(f) & 416.920(f).

[34] S.S.R. 82-61 (Soc. Sec. Admin. Jan. 1, 1982), *available at* 1982 WL 31387 at *2.  Social Security Rulings are "binding on all components of the Social Security Administration."  *Pinto v. Massanari*, 249 F.3d 840, 844 n.3 (9th Cir. 2001).  They are "entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations."  *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) (quoting *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005)).

[35] 20 C.F.R. §§ 404.1520(a)(4)(iv) & 416.920(a)(4)(iv).

[36] A.R. 604.

disabled.[37]  *Because the ALJ determined at Step 4 that Plaintiff was capable of performing past relevant work, Step 5 was not reached*.[38]

### III.    PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was born in 1971 and was 43 years old on the alleged disability onset date.[39]  He filed applications for DIB and SSI on or about May 28, 2018.[40] Plaintiff reported last working as a medical equipment service technician.[41]  In August 2018, the SSA determined that Plaintiff was not disabled under the applicable rules.[42]  Plaintiff then requested a hearing before an ALJ.[43]

Plaintiff appeared and testified at a hearing without representation before ALJ Paul T. Hebda on August 27, 2019, in Anchorage, Alaska.[44]  On October 2,

---

[37] 20 C.F.R. §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v).

[38] *See* A.R. 604–05.

[39] A.R. 733, 735.

[40] A.R. 640, 657.

[41] A.R. 627–28.

[42] A.R. 655, 672.  *See also* A.R. 676.

[43] *See* A.R. 682–83.

[44] A.R. 609–39.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 9 of 50

2019, the ALJ issued an unfavorable ruling.[45]  The SSA Appeals Council denied Plaintiff's request for review on July 27, 2020.[46]

On September 9, 2020, Plaintiff, now represented by counsel, filed suit in this Court seeking review of the decision.[47]  The Commissioner answered Plaintiff's complaint on February 11, 2021.[48]  Plaintiff filed his opening motion and brief on March 30, 2021,[49] the Commissioner filed an opposing brief on April 29, 2021,[50] and Plaintiff filed his reply brief on May 3, 2021.[51]

## IV.  DISCUSSION

Plaintiff alleges that the ALJ erred by: (1) failing to make sufficient findings and misclassifying Plaintiff's past relevant work; (2) failing to assist Plaintiff in developing the record; (3) making a Step Two determination that is not supported by substantial evidence and contains legal errors; (4) failing to articulate sufficient reasons for finding the medical experts' opinions persuasive or unpersuasive; and (5) failing to articulate sufficient reasons for discounting Plaintiff's symptom

---

[45] A.R. 594–605.

[46] A.R. 1–7.

[47] Docket 1.

[48] Docket 20.

[49] Docket 25.

[50] Docket 26.

[51] Docket 27.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 10 of 50

testimony. Plaintiff also alleges that new evidence submitted to the Appeals Council undermines the ALJ's decision.

The Commissioner disputes Plaintiff's arguments and asks this Court to affirm the agency's determination.

*1. The ALJ's Classification of Plaintiff's Past Relevant Work*

Plaintiff maintains that the ALJ's classification of his past relevant work as "Medical Assistant," *Dictionary of Occupational Titles ("DOT")* 079.362-010, a light exertional position, is not supported by substantial evidence. Plaintiff asserts that his past relevant work should have been classified as "Medical Equipment Repairer," *DOT* 639.281-022, which the *DOT* characteries as a "heavy" exertional position, and hence, not within Plaintiff's RFC.[52]

The Commissioner responds that given the vocational expert's 35 years of vocational experience, the ALJ's reliance on his testimony that Plaintiff's past relevant work was best classified under the "Medical Assistant" *DOT* entry constitutes substantial evidence.[53]

At Step Four, a claimant must prove that he cannot perform his past relevant work, either as he had actually performed that work or as it is generally performed in the national economy. A claimant's testimony is the "primary source" for his work

---

[52] Docket 25 at 4–7.

[53] Docket 26 at 17–18.

history and is "generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work."[54]  A claimant's "[p]ast work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work."[55]  A vocational expert's testimony "concerning the physical and mental demands of a claimant's past work, either as the claimant actually performed it or as generally performed in the national economy," can be "helpful in supplementing or evaluating the accuracy of the claimant's description of his past work."[56]

When evaluating a claimant's past job as generally performed, the *DOT* is usually "the best source."[57]  But reliance on the *DOT* alone can be insufficient, and SSA policy warns that "[f]inding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification is likely to be fallacious and unsupportable."[58]

---

[54] S.S.R. 82-62, 1982 WL 31386 at *3.

[55] *Id.  See also Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1166–67 (9th Cir. 2008) (emphasis added) ("Only if the ALJ finds that the claimant can no longer perform his past work, *as properly classified*, does the analysis move to the fifth and final step . . . .").

[56] 20 C.F.R. § 404.1560(b)(2).

[57] *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001).

[58] *Id.* (quoting S.S.R. 82-61, 1982 WL 31387 at *1).

In this case, the ALJ adopted the VE's conclusion that *DOT* entry 079.362-010 properly represents Plaintiff's past relevant work as a medical equipment service technician. *DOT* 079.362-010 is the occupation "Medical Assistant." The *DOT* describes the duties of that position as follows:

> Performs any combination of following duties under direction of physician to assist in examination and treatment of patients: Interviews patients, measures vital signs, such as pulse rate, temperature, blood pressure, weight, and height, and records information on patients' charts. Prepares treatment rooms for examination of patients. Drapes patients with covering and positions instruments and equipment. Hands instruments and materials to doctor as directed. Cleans and sterilizes instruments. Inventories and orders medical supplies and materials. Operates x-ray, electrocardiograph (EKG), and other equipment to administer routine diagnostic test or calls medical facility or department to schedule patients for tests. Gives injections or treatments, and performs routine laboratory tests. Schedules appointments, receives money for bills, keeps x ray and other medical records, performs secretarial tasks, and completes insurance forms. May key data into computer to maintain office and patient records. May keep billing records, enter financial transactions into bookkeeping ledgers, and compute and mail monthly statements to patients.[59]

Neither Plaintiff's testimony nor his Work History Report contain any evidence that he ever performed any of these duties. Plaintiff's Work History Report described his past occupation to be "service tech" and indicated that he

---

[59] *Id.* DOT 079.362-010, *available at* 1991 WL 646852, *also available at* https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOT01C

"serviced medical equipment" and made "deliveries of med[ical] equip[ment]."[60] At the agency hearing, Plaintiff testified that he had been a "service technician" for "medical equipment."[61] The ALJ remarked to Plaintiff that "it looked like you were doing some pretty heavy work as the service tech," to which Plaintiff replied, "I was. Pretty heavy beds and stuff like that. I was a technician."[62] Plaintiff spoke of being a "durable medical equipment provider" and having to do "a lot of math" to "fix things."[63] The ALJ did not ask Plaintiff any questions about the details of his work.[64]

Vocational expert William Weiss testified that Plaintiff's work as a "service tech for medical equipment" would "typically be placed in the *DOT* 079.362-010."[65] But he gave no explanation for the discrepancy between the "Medical Assistant" duties described in that *DOT* entry and the information from Plaintiff's Work History Report and testimony, and the ALJ did not attempt to investigate the disparity. The VE testified that "medical service technician is mentioned in the body of the

---

[60] A.R. 788.

[61] A.R. 627–28.

[62] A.R. 633.

[63] A.R. 633–34.

[64] *See* A.R. 627–34.

[65] A.R. 636.

*DOT*."[66]  But the last official edition of the *DOT*, published in 1991, makes no mention of "medical service technicians" in *DOT* 079.362-010.[67]

Citing *Gutierrez v. Colvin*[68] for the proposition that the *DOT* "describes occupations that are broader than any individual position, and therefore includes duties that many people who hold such positions may never perform," the Commissioner maintains that it was not legal error for the ALJ to conclude that the "Medical Assistant" *DOT* entry represented Plaintiff's past relevant work as generally performed.[69]  This argument is unavailing.  *Gutierrez* addressed whether, at Step Five, there had been an "apparent or obvious" conflict between a vocational expert's testimony and the *DOT*'s listing for a particular occupation's maximum requirements that should have triggered the ALJ's duty to "follow up."[70]  The *Gutierrez* plaintiff did not allege that the ALJ had used the incorrect *DOT* entry for her past work experience.[71]  This case involves no such conflict between the

---

[66] *Id.*

[67] *DOT* 079.362-010, 1991 WL 646852.

[68] 844 F.3d 804 (9th Cir. 2016).

[69] Docket 26 at 17.

[70] *Gutierrez*, 844 F.3d at 806–08.

[71] *See id.* at 807 (footnote omitted) ("Ms. Gutierrez's principal argument on appeal is that because the *Dictionary* definition specifies that cashiers must engage in frequent 'reaching,' the ALJ erred at step five by not asking the expert more specific questions regarding her ability to perform the job given that she can't reach overhead with her right arm.").

vocational expert's testimony and the *DOT*.  Rather, it involves a conflict between Plaintiff's testimony and the *DOT* occupation that the ALJ and the vocational expert used to identify Plaintiff's past relevant work and guide their analysis of its exertional demands.[72]

In sum, the record contains no evidence that Plaintiff ever performed the duties of a "medical assistant" as that occupation is defined in the *DOT*.  The ALJ simply adopted the VE's testimony that this *DOT* category applied to Plaintiff's past relevant work as generally performed.  Therefore, the ALJ's conclusion that Plaintiff's former job was the light exertional work of a medical assistant is not supported by substantial evidence in the record as a whole.  Given that the proper classification of Plaintiff's past relevant work may have been an occupation whose exertional demands Plaintiff lacks the RFC to perform, the Court concludes that the ALJ's error is not harmless and requires remand.[73]

---

[72] Plaintiff maintains that "Medical Equipment Repairer," *DOT* 639.281-022, is the most accurate classification of his past work.  The *DOT* classifies "Medical Equipment Repairer" as a "heavy" exertional occupation.  But the ALJ concluded that Plaintiff's RFC was limited to "light work." A.R. 601.  Classification as a "Medical Equipment Repairer" may have resulted in a Step Four finding that Plaintiff lacked the RFC to perform his past work and required the agency to proceed to Step Five.

[73]  In light of the remand based on the lack of substantial evidence to support the classification of Plaintiff's past work, the Court does not reach Plaintiff's related argument that challenged the sufficiency of the ALJ's findings  that Plaintiff was capable of performing his past relevant work. *See generally* Docket 25 at 4 (citing *Pinto*, 249 F. 3d at 847).

*2.  The ALJ's Development of the Record*

Plaintiff alleges that the ALJ failed to discharge his duty to "fairly develop the record" and "assure that the claimant's interests are considered" in two ways.[74] First, Plaintiff asserts the ALJ did not fully question the vocational expert about his classification of Plaintiff's past relevant work.  He maintains that had the ALJ done so, he could have discovered that the vocational expert misclassified Plaintiff's past relevant work as "light" instead of "heavy" and that Plaintiff needed accommodations to perform his past relevant work.[75]

Second, Plaintiff asserts that his testimony that he had been diagnosed with fibromyalgia and prescribed Lyrica, amitriptyline, and naltrexone required the ALJ to, at the very least, "inquire whether all of the relevant medical records pertaining to [Plaintiff's] impairments had been submitted at the time of the hearing."  Instead, the ALJ failed to inquire at all regarding Plaintiff's fibromyalgia.  Plaintiff alleges that had the ALJ further developed the record on that subject, the ALJ might not

---

[74] Plaintiff also asserts that the ALJ violated his duty to develop the record by failing to clarify technical terms such as *DOT* codes, "SVP," "GED," and the like.  Docket 25 at 7.  But Plaintiff makes no legal argument to support this assertion, and the Court will not address it.  *See, e.g.*, *Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204, 1210 n.4 (9th Cir. 2013) (declining to address a passing assertion that lacked supporting legal arguments); *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1182 (9th Cir. 2001) ("Issues raised in a brief which are not supported by argument are deemed abandoned.").

[75] Docket 25 at 7–8.

have concluded that Plaintiff's symptom testimony was not entirely consistent with the objective medical evidence.[76]

The Commissioner maintains that any error in the ALJ's alleged failure to investigate Plaintiff's fibromyalgia was harmless because it occurred at Step Two, which involves "merely a threshold determination meant to screen out weak claims."[77]

Although social security claimants bear the burden of establishing their disabilities,[78] ALJs have a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[79] This duty is "heightened" when, as here, a claimant was not represented by counsel when appearing before the agency.[80] "[W]here the claimant is not represented, it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. He must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."[81] This imposes a "heavy

---

[76] *Id.* at 8–10.

[77] Docket 26 at 2, 20–21 (quoting *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017)).

[78] 20 C.F.R. §§ 404.1512(a)(1) & 416.912(a)(1).

[79] *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)).

[80] *Id.*

[81] *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992) (quoting *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978)).

burden" on ALJs in such situations and "demand[s] that the case be remanded" if an ALJ's failure to develop the record prejudices an unrepresented claimant.[82]

In this case, the ALJ did not fulfill this "heightened" duty to ensure Plaintiff's interests were protected. First, as discussed above, the vocational expert's testimony on the *DOT* classification of Plaintiff's past relevant work differed markedly from the evidence in the record.[83] The ALJ made no inquiry into this discrepancy. Considering Plaintiff's lack of representation at the hearing, the ALJ's failure to investigate such a manifest discrepancy violated his heightened duty to fully develop the record and ensure Plaintiff's interests were protected. The ALJ's decision must be remanded for further development of the record on this point.

Second, the ALJ violated his duty to develop the record regarding Plaintiff's stated fibromyalgia. At the hearing, Plaintiff stated that he had been prescribed medication for fibromyalgia: "As far as the chronic headaches and chronic pain, the—the removal of the cavernoma in my left pons left me with scar tissues, that's caused severe nerve path pain throughout my body. That is what the Lyrica is for—throughout my muscles—the fibromyalgia pain."[84] The medical records the ALJ had at the time contained an ambiguous assessment of Plaintiff's fibromyalgia

---

[82] *Id.* (quoting *Vidal v. Harris*, 637 F.2d 710, 714–15 (9th Cir. 1981)).

[83] Section (1), *supra*.

[84] A.R. 621.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 19 of 50

symptoms. In September 2018, Plaintiff's primary care physician observed that Plaintiff "did not seem to have tender points consistent with fibromyalgia" but also noted that "his migratory pain is consistent with that type of diagnosis."[85]

This evidence for Plaintiff's medical diagnosis and the accompanying prescription, combined with Plaintiff's testimony, should have triggered the ALJ to investigate further. Had he done so, he would likely have discovered additional medical records indicating that a physiatrist had diagnosed Plaintiff with fibromyalgia no later than July 18, 2018.[86] The SSA recognizes fibromyalgia as a medically determinable impairment that can serve as a basis for disability benefits.[87] Because the ALJ did not probe into Plaintiff's statements about his fibromyalgia, the record lacked the relevant medical records, which prevented the ALJ from properly evaluating it at Steps Two, Three, and Four and requires remand for further development of the record.

3. *Whether the ALJ's Step Two Determination Was Supported by Substantial Evidence*

At Step Two, the ALJ found that Plaintiff had several severe physical impairments. But the ALJ determined that Plaintiff's resected cavernoma was not

---

[85] A.R. 47.

[86] *See* A.R. 472.

[87] S.S.R. 12-2p (Soc. Sec. Admin. July 25, 2012), 77 Fed. Reg. 43640, 43641, 2012 WL 3104869, at *2.

a severe physical impairment because "imaging has shown the cavernoma has not changed, and an EEG has been normal. In addition, . . . the claimant reported improvement of his headaches with the occipital nerve stimulator. Further, the claimant continues to drive."[88]

The ALJ also concluded that Plaintiff's unspecified neurocognitive disorder and adjustment disorder were not severe mental impairments. Based on Dr. Youngblood's neuropsychological evaluation, the ALJ concluded that Plaintiff had "no limitation" in each of the four functional areas and therefore did not have any severe mental impairments.[89]

Plaintiff alleges that the ALJ committed legal error at Step Two by applying the "weighing of the evidence" standard for assessing residual functional capacity to determine whether his mental health disorders constituted severe mental impairments, rather than the "more than minimal limitation" Step Two standard. Plaintiff alleges that if the ALJ had applied the correct standard at Step Two, he would have found that Plaintiff's cavernoma and mental health impairments constituted severe impairments and included the limitations caused by these impairments in the RFC. Plaintiff analogizes his case to *Few v. Commissioner of*

---

[88] A.R. 597–98.

[89] A.R. 599–600.

*Social Security*,[90] in which the court remanded an ALJ decision because it had applied "an impermissibly high standard" when evaluating mental impairments at Step Two instead of the proper "*de minimis*" standard.[91]

The Commissioner maintains that substantial evidence supports the ALJ's determination that Plaintiff's cavernoma and mental health disorders only minimally limited him and were therefore not severe. And she asserts that any error at Step Two is harmless, because so long as the ALJ found at least one severe impairment so as to proceed further in the analysis, then all impairments, whether severe or not, are to be considered in developing the RFC, and that occurred here.[92]

In reply, Plaintiff asserts that the cases the Commissioner cites for the proposition that Step Two errors are normally harmless are not relevant to Plaintiff's case because, unlike here, the ALJs in those cases "extensively" discussed the claimants' non-severe limitations when determining their RFCs.[93]

    a) <u>Whether substantial evidence supports the ALJ's determination that Plaintiff's cavernoma and mental health disorders are not severe impairments</u>

---

[90] Case No. 2:19-cv-1491-KJN, 2021 WL 1103706, at *1 (E.D. Cal. Mar. 23, 2021).

[91] Docket 25 at 14–17 (quoting *Few*, 2021 WL 1103706, at *3–4).

[92] Docket 26 at 2 (citing *Buck*, 869 F.3d at 1048 (emphasizing that the RFC should "be exactly the same regardless of whether certain impairments are considered 'severe' or not")).

[93] Docket 27 at 8–9, *citing Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 22 of 50

At Step Two, a social security claimant bears the burden of showing through medical evidence that he has a severe impairment.[94] To be "severe," a claimant's impairment or combination of impairments must "significantly limit[]" his "physical or mental ability to do basic work activities."[95] An ALJ may find an impairment non-severe at Step Two "*only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work."[96]

The Step Two analysis is "merely a threshold determination meant to screen out weak claims."[97] Step Two is not meant to restrict the impairments to be considered when assessing a claimant's RFC. Rather, the determination of the RFC must include "all of an individual's impairments, even those that are not severe."[98] Accordingly, even if an ALJ erroneously finds that a particular

---

[94] 20 C.F.R. §§ 404.1512 & 416.912; *see also, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1159–60 (9th Cir. 2001) ("[O]nce a claimant has shown that he suffers from a medically determinable impairment, he next has the burden of proving that these impairments or their symptoms affect his ability to perform basic work activities.").

[95] 20 C.F.R. §§ 404.1520(c), 404.1522(a), 416.920(c) & 404.922(a).

[96] *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (emphasis in original) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)).

[97] *Buck*, 869 F.3d at 1048. *See also Webb*, 433 F.3d at 687 (characterizing Step Two as "a *de minimis* screening device used to dispose of groundless claims").

[98] *Id.* at 1048–49 (internal quotation marks omitted).

impairment is not severe at Step Two, such error is harmless so long as the limitations of that impairment are considered in determining the RFC.[99]

In this case, the ALJ determined at Step Two that Plaintiff's cavernoma would not result in "significant vocational limitations" and was not a severe impairment because "imaging has shown the cavernoma ha[s] not changed, and an EEG has been normal. In addition, . . . [Plaintiff] reported improvement of his headaches with the occipital nerve stimulator. Further, [Plaintiff] continues to drive."[100] But in his formulation of Plaintiff's RFC at the outset of Step Four, the ALJ did not mention Plaintiff's cavernoma, headaches, or other related impairments at all.[101]

The record contains considerable evidence that Plaintiff's cavernoma and headaches more than minimally affected his ability to work. Plaintiff had a pontine

---

[99] *See Lewis*, 498 F.3d at 911 ("The ALJ extensively discussed [the claimant's impairment] at Step 4 of the analysis . . . . The decision reflects that the ALJ considered any limitations posed by the [impairment] at Step 4. As such, any error that the ALJ made in failing to include the [impairment] at Step 2 was harmless."). *See also, e.g.*, *Stephens v. Colvin*, 671 F. App'x 557, 558 (9th Cir. 2016) ("Assuming the ALJ erred at step two by not addressing whether [the claimant]'s chronic pain syndrome was a severe impairment, the error was harmless. The ALJ considered the associated limitations in the RFC assessment at step four."); *Cindy F. v. Berryhill*, 367 F. Supp. 3d 1195, 1207 (D. Ore. 2019) ("When an ALJ fails to identify a severe impairment at step two, but nonetheless considers at subsequent steps all of the claimant's impairments, including the erroneously omitted severe impairment, the error at step two is harmless.").

[100] A.R. 598.

[101] A.R. 601–04.

cavernoma[102] that was partially resected in 2014 and is now stable.[103] He also has chronic headaches that were historically well-controlled with an occipital nerve stimulator he had implanted in 2016.[104] New evidence indicates Plaintiff had the stimulator removed in 2019 to facilitate MRI scans and because "he thought he was doing pretty well."[105] But the new evidence also shows that Plaintiff has begun getting headaches "nearly daily." His neurologist has begun treating his headaches "as though they were migraines" and has prescribed medication accordingly.[106]

SSA medical expert Dr. Ron Feigin opined that Plaintiff's medical records show "marked improvement" of his cavernoma-related symptoms.[107] Dr. Feigin reasoned that Plaintiff's cavernoma was unlikely to be a severe impairment because he had continued to work full-time in the years after his procedure: "A

---

[102] A.R. 320–25. Cavernomas, also known as cavernous hemangiomas, are benign congenital tumors consisting of blood-filled cystic spaces. *Cavernoma, Cavernous hemangioma*, MOSBY'S MED., NURSING & ALLIED HEALTH DICTIONARY 216 (3d ed. 1990). *See also Cavernous hemangioma*, STEDMAN'S MED. DICTIONARY 397300 (2014) ("Old term for deep cutaneous hemangioma with dilated vessels on gross and microscopic examination. Also used incorrectly for venous malformation."). The pons is the part of the brainstem between the medulla oblongata and mesencephalon. *Pons*, STEDMAN'S MED. DICTIONARY 711570 (2014).

[103] A.R. 465, 948, 953.

[104] A.R. 953.

[105] A.R. 464.

[106] A.R. 465.

[107] A.R. 663.

neurocognitive disorder severe enough to presently prevent claimant from engaging in full-time work, as alleged by the examiner, would have previously prevented employment. Claimant, however, maintained gainful employment at a SVP 6 job through 2017."[108]

But the fact that Plaintiff was able to maintain gainful employment through 2017 has little relevance to the period after January 1, 2018, for which he seeks benefits. Moreover, recent records, including those submitted to the Appeals Council, indicate that Plaintiff's headaches have worsened. Near-daily headaches of a severity that require prescribed medication are not a "slight abnormality" that produce only a "minimal effect on an individual's ability to work."[109]

Taken as a whole, the record contains considerable evidence that Plaintiff's headaches constitute more than a minimal limitation on his ability to perform basic work activities. Because the ALJ did not consider Plaintiff's headaches at all when determining his RFC, the ALJ's error was not harmless and requires remand.

b) Whether Plaintiff's neurocognitive disorder constituted a severe mental impairment.

The SSA uses a "special technique" to evaluate mental impairments.[110] The ALJ must first assess whether a claimant has a medically determinable mental

---

[108] A.R. 663, 933.

[109] *Webb*, 433 F.3d at 686 (quoting *Smolen*, 80 F.3d at 1290).

[110] 20 C.F.R. §§ 404.1520a(a) & 416.920a(a).

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 26 of 50

impairment, then rate the "degree of functional limitation" resulting from the claimant's mental impairment.[111]  Mental impairments are rated across four "broad functional areas": (1) "understand, remember, or apply information;" 2) "interact with others;" (3) "concentrate, persist, or maintain pace;" and (4) "adapt or manage oneself."[112]  The ALJ's decision "must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)."[113]

The ALJ "must include a specific finding as to the degree of limitation" for each of the four functional areas.[114]  There are five possible degrees of functional limitation: "none," "mild," "moderate," "marked," and "extreme."[115]  If a mental impairment results in a degree of functional limitation of "none" or "mild," the mental impairment is deemed non-severe unless other evidence indicates there is "more than a minimal limitation" in a claimant's "ability to do basic work activities."[116]  The

---

[111] 20 C.F.R. §§ 404.1520a(b)–(c) & 416.920a(b)–(c).

[112] 20 C.F.R. §§ 404.1520a(c)(3) & 416.920a(c)(3).

[113] 20 C.F.R. §§ 404.1520a(e)(4) & 416.920a(e)(4).

[114] *Id.*

[115] 20 C.F.R. §§ 404.1520a(c)(4) & 416.920a(c)(4).

[116] 20 C.F.R. §§ 404.1520a(d)(1) & 416.920a(d)(1).

"extreme" degree represents "a degree of limitation that is incompatible with the ability to do any gainful activity."[117]

SSA regulations do not specify whether "moderate" or "marked" degrees of limitation constitute a severe mental impairment. No controlling authority addresses the question, although several unpublished decisions in this circuit have concluded that SSA regulations imply that a "moderate" degree of functional limitation tends to indicate severe impairment.[118]

Here, substantial evidence in the record supports the ALJ's conclusion that Plaintiff's neurocognitive disorder and adjustment disorder did not constitute severe mental impairments. Dr. Keith Youngblood's neuropsychological evaluation found that Plaintiff's verbal comprehension index score "suggest[ed] a lateralized weakness to the left hemisphere," but it was still within the "low average" range.[119] Dr. Youngblood also wrote that Plaintiff had a "slow processing speed," although it too was still within the "low average" range.[120] All of Plaintiff's other

---

[117] 20 C.F.R. §§ 404.1520a(c)(4) & 416.920a(c)(4).

[118] E.g., *Allen v. Comm'r of Soc. Sec. Admin.*, 498 F. App'x 696, 697 (9th Cir. 2012) ("A moderate limitation in activities of daily living and in maintaining concentration, persistence, or pace tends to show the presence of a severe mental impairment."); *Cote v. Colvin*, Case No. 3:15-cv-00103-SI, 2015 WL 7871169 at *8 (D. Ore. Dec. 4, 2015) ("Moderate limitations are frequently consistent with the presence of a severe mental impairment.").

[119] A.R. 931, 934.

[120] A.R. 932–33.

neuropsychological measurements were in the average or above-average ranges.[121]   Dr. Youngblood found that Plaintiff showed "some degree of mild depression, not surprising for the situation he is in."  In his recommendations, Dr. Youngblood stated that Plaintiff "might be capable of finding some gainful employment on a part-time basis," although "the range of options [might be] very narrow, and there is a possibility that even part-time work may be too stressful." But according to Dr. Youngblood, these limitations on the range of Plaintiff's work options are the result of his "[i]ssues involving fatigue/stamina, pain, and orthopedic limitations," rather than the result of mental impairments.[122]

The other medical experts agreed that Plaintiff's mental impairments were not severe.   In his psychiatric review, Dr. Feigin concluded that Plaintiff had a "moderate" degree of functional limitation in the "understand, remember, and apply information" functional area, but only "mild" or "none" degrees in the other three areas.[123]   Dr. Feigin did not explain his conclusion that Plaintiff was moderately limited in the "understand, remember, and apply information" functional area, and ultimately concluded that Plaintiff's mental impairments were not severe.[124]

---

[121] A.R. 931–32, 934.

[122] A.R. 935.

[123] A.R. 647, 664–65.

[124] A.R. 664.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 29 of 50

Furthermore, medical expert Colette Valette, Ph.D., opined at Plaintiff's hearing that the "low average versus average range" results in Dr. Youngblood's testing showed Plaintiff's mental impairments were non-severe.[125]

Accordingly, the Court concludes that substantial evidence supports the ALJ's finding that Plaintiff's unspecified neurocognitive disorder and adjustment disorder did not constitute severe mental impairments. Nonetheless, on remand the ALJ shall address the extent to which these impairments may impact Plaintiff's ability to work when formulating the RFC.[126]

### 4. The ALJ's Assessment of the Medical Experts' Opinions

Plaintiff alleges that the ALJ committed legal error in his assessment of the opinions of medical experts Keith Youngblood, Psy.D., Ron Feigin, M.D., Shirley Fraser, M.D., Jay Caldwell, M.D., and Stephen Andersen, M.D.[127]

Pursuant to the SSA's new regulations for evaluating the persuasiveness of medical opinions, which apply to claims filed on or after March 27, 2017,[128] the ALJ

---

[125] A.R. 623–24.

[126] *See Lewis*, 498 F.3d at 911. At the conclusion of Step Two, the ALJ acknowledges that the mental residual functional capacity assessment used for Steps 4 and 5 "requires a more detailed assessment" than at Step 2. However, the RFC analysis is silent as to Plaintiff's mental health limitations and focuses instead on physical residual functional capacity. *Compare* A.R. 600 *and* A.R. 601–604.

[127] Docket 25 at 17–24.

[128] Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5844 (Soc. Sec. Admin. Jan. 18, 2017), codified at 20 C.F.R. §§ 404.1520c & 416.920c.

must evaluate all medical opinions in the record without giving any of them deference or "specific evidentiary weight."[129]  The ALJ evaluates medical opinions on five factors: supportability, consistency, the expert's relationship with the claimant, the expert's specialization, and other factors.[130]

In determining the persuasiveness of a medical source's opinion, supportability and consistency are the most important factors, and the ALJ's decision must explain how he considered them.[131]  SSA regulations define supportability to be "[how] relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s)."[132]  The regulations define consistency to be "[how] consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim."[133]

The Court assesses each medical expert in turn.

　　a. Keith Youngblood, Psy.D.

---

[129] 20 C.F.R. §§ 404.1520c(a) & 416.920c(a).

[130] 20 C.F.R. §§ 404.1520c(c) & 416.920c(c).

[131] 20 C.F.R. §§ 404.1520c(b)(2) & 416.920c(b)(2).  ALJs must discuss their consideration of the other three factors only if they "find that two or more medical opinions or prior administrative medical findings about the same issue are equally well-supported . . . and consistent with the record . . . but are not exactly the same."  20 C.F.R. §§ 404.1520c(b)(3) & 416.920c(b)(3).

[132] 20 C.F.R. §§ 404.1520c(c)(1) & 416.920c(c)(1).

[133] 20 C.F.R. §§ 404.1520c(c)(2) & 416.920c(c)(2).

Dr. Keith Youngblood performed a neuropsychological examination of Plaintiff and concluded that Plaintiff's limitations in his ability to handle stress resulting from his mental health impairments, in combination with his orthopedic and other physical impairments, would make it "difficult if not impossible for him to be successful in competitive employment."[134] The ALJ found Dr. Youngblood's opinion unpersuasive, stating that it was inconsistent with Dr. Youngblood's own examination's findings, citing Plaintiff's average full-scale IQ ("FSIQ") score of 94, and that it improperly addressed physical impairments that were outside the examination's scope.[135]

Plaintiff alleges that the ALJ committed legal error by "substituting his own lay opinion for that of Youngblood" on the proper scope of the neuropsychological examination and by failing to consider Plaintiff's impairments in combination. And Plaintiff maintains that the ALJ's opinion does not explain how an FSIQ score of 94 is inconsistent with a finding of work-related stress limitations.[136]

The Commissioner responds that the ALJ reasonably concluded that Plaintiff's normal exam results conflicted with Dr. Youngblood's mental impairment opinion. The Commissioner also maintains that it was reasonable for the ALJ to

---

[134] A.R. 926–35.

[135] A.R. 598–99.

[136] Docket 25 at 17–19.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 32 of 50

discount Dr. Youngblood's opinion because, as a psychologist, Dr. Youngblood "was in no position to comment on the limiting effects of Plaintiff's orthopedic and other physical impairments."[137]

In reply, Plaintiff maintains that the Commissioner's arguments about Dr. Youngblood's opinion exceeding the scope of his expertise fail because Dr. Youngblood opined only on the psychological effects of Plaintiff's orthopedic and physical limitations, not the physical limitations themselves.[138]

The Court concludes that the ALJ failed to adequately evaluate the consistency of Dr. Youngblood's opinion with the other evidence in the record. The ALJ's only example of the inconsistency of Dr. Youngblood's opinion that Plaintiff was unlikely to be able to succeed in competitive employment was his observation that Dr. Youngblood "found [Plaintiff]'s full scale intelligence quotient was 94 which was in the average range."[139] The ALJ does not explain how Plaintiff's average FSIQ score is inconsistent with Dr. Youngblood's conclusions that Plaintiff's mental impairments would limit his ability to work; nor does he provide any discussion of the consistency of Dr. Youngblood's opinion with the other medical and nonmedical sources.

---

[137] Docket 26 at 11–12.

[138] Docket 27 at 11–12.

[139] A.R. 599.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 33 of 50

The ALJ's decision also does not clearly discuss the supportability of Dr. Youngblood's opinion. The ALJ noted that Dr. Youngblood "appeared to be taking [Plaintiff]'s physical impairments into account, for which he was not evaluating [Plaintiff] and are not his area of expertise."[140] It is not clear if this was intended to constitute a discussion of supportability. But the ALJ's opinion contains no other discussion of the supportability of Dr. Youngblood's opinion. Because of its minimal discussion of supportability and consistency, the Court concludes that the ALJ's discussion of Dr. Youngblood's opinion failed to comply with SSA regulations.

b. Ron Feigin, M.D.

Dr. Ron Feigin reviewed Plaintiff's medical records and produced a mental residual functional capacity assessment in which he concluded that Plaintiff's understanding and memory capacity was limited to "follow[ing] short and simple instructions."[141] Dr. Feigin opined that Plaintiff was moderately limited in his abilities "to remember locations and work-like procedures," "to understand and remember detailed instructions," "to carry out detailed instructions," "to sustain an ordinary routine without special supervision," and "to respond appropriately to changes in the work setting."[142] The ALJ found Dr. Feigin's assessment

---

[140] A.R. 599.

[141] A.R. 651–53.

[142] A.R. 652–53.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 34 of 50

unpersuasive, stating that it was "not consistent with the overall record." The ALJ noted that "the claimant was found to have a full scale IQ score in the average range" during neuropsychological testing, and stated that he found the opinion of Colette Valette, Ph.D., more persuasive than Dr. Feigin's.[143]

Plaintiff asserts that the ALJ committed legal error because his explanation of Dr. Feigin's assessment's lack of consistency was "vague and conclusory." Plaintiff also maintains that the ALJ's reliance on Dr. Valette's opinion was "misplaced" because the ALJ found that Plaintiff's adjustment disorder was a medically determinable mental impairment, but Dr. Valette's opinion did not.[144]

As with his assessment of Dr. Youngblood's opinion, the ALJ's decision gives only a fleeting discussion of the consistency of Dr. Feigin's opinion with the other medical evidence in the record. The ALJ again simply points out that neuropsychological testing showed Plaintiff's FSIQ was in the average range. And the ALJ's discussion of Dr. Feigin's opinion does not evaluate supportability at all.[145] Therefore, the Court concludes that the ALJ's evaluation of the persuasiveness of Dr. Feigin's opinion failed to comply with SSA regulations.

c. <u>Shirley Fraser, M.D.</u>

---

[143] A.R. 599.

[144] Docket 25 at 19–20.

[145] A.R. 599.

Dr. Shirley Fraser reviewed Plaintiff's medical records and produced a physical residual functional capacity assessment concluding that Plaintiff's right arm could only perform limited pushing and pulling and limited handling, that he had limited depth perception and field of vision in his left eye, that he had a permanent left sixth nerve palsy, and that he should avoid marked right wrist movements.[146] The ALJ found Dr. Fraser's assessment unpersuasive, stating that it was "not consistent with the overall objective medical evidence." The ALJ found Dr. Fraser's opinion on Plaintiff's RFC to be less persuasive than the opinion of the medical expert who testified at Plaintiff's hearing, Dr. Stephen Andersen, because Dr. Andersen "had the opportunity to review the longitudinal record at the hearing level" and was familiar with SSA rules and regulations.[147]

Plaintiff maintains that the ALJ's reason for finding Dr. Fraser's assessment unpersuasive was "vague and conclusory," and not supported by substantial evidence.[148] Plaintiff adds that the ALJ failed to articulate specific reasons for discounting Dr. Fraser's assessment and crediting Dr. Andersen's. Plaintiff focuses on Dr. Fraser's conclusion regarding Plaintiff's vision, asserting there is no

---

[146] A.R. 649–51.

[147] A.R. 604.

[148] Docket 25 at 21 (citing *Regenitter*, 166 F.3d at 1299). *See also Embrey*, 849 F.2d at 421; *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226 (9th Cir. 2009) ("[M]eaningful review of an administrative decision requires access to the facts and reasons supporting that decision.").

objective medical evidence that contradicts Dr. Fraser's opinion that Plaintiff's field of vision and depth perception are both limited in his left eye.[149]

The Commissioner maintains that the ALJ was correct to find Dr. Fraser's assessment unpersuasive because other medical evidence in Plaintiff's file "undermined" her opinion.[150]

The ALJ's evaluation of Dr. Fraser's opinion did not meet SSA requirements. After recounting her opinion, the ALJ simply stated that he found her opinion "to not be persuasive, as [it is] not consistent with the overall objective medical evidence."[151]   The ALJ gave no examples of the inconsistency of Dr. Fraser's opinion nor any explanation of his conclusion.  And the ALJ made no mention of supportability at all.  Such deficiencies fall below the SSA regulations' requirement that the ALJ explain how he considered the key factors of supportability and consistency, and constitute legal error.

d. Jay Caldwell, M.D.

Dr. Jay Caldwell reviewed Plaintiff's medical records and provided a physical residual functional capacity assessment concluding that Plaintiff was limited to frequent handling and fingering with his right hand and occasional handling and

_____

[149] Docket 25 at 21–22.

[150] Docket 26 at 13–15.

[151] A.R. 604.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 37 of 50

fingering with his left hand. He also concluded that Plaintiff was limited to frequent stooping, occasional lifting of 20 pounds, and frequent lifting of 10 pounds, and that he should avoid moderate exposure to fumes.[152]

The ALJ assessed Dr. Caldwell's opinion together with Dr. Fraser's, and his decision does not distinguish his evaluation of the two opinions. As with Dr. Fraser's opinion, the ALJ found Dr. Caldwell's assessment unpersuasive, stating that it was "not consistent with the overall objective medical evidence" and that Dr. Andersen's opinion was more persuasive because Dr. Andersen "had the opportunity to review the longitudinal record at the hearing level" and was familiar with SSA rules and regulations.[153]

Plaintiff maintains that the ALJ's evaluation of Dr. Caldwell's opinion contains the same legal error as his evaluation of Dr. Fraser's opinion.[154] The Court agrees. The ALJ's is legally deficient for the same reasons identified with respect to Dr. Fraser's opinion and failed to comply with the applicable SSA regulations.

> e. Stephen Andersen, M.D.

Dr. Stephen Andersen reviewed Plaintiff's medical records and testified at the hearing as the ALJ's medical expert. Dr. Andersen determined Plaintiff's main

---

[152] A.R. 936–43.

[153] A.R. 604.

[154] Docket 25 at 23–24.

exertional limitations to be: frequent lifting and carrying of 10 pounds; occasional lifting and carrying of 20 pounds; standing and walking six out of eight hours per day; sitting six out of eight hours per day, frequent pushing and pulling; frequent stooping; and frequent handling and fingering.[155]  The ALJ found Dr. Andersen's opinion more persuasive than those of Drs. Fraser and Caldwell, finding that it was consistent with the overall record and because Dr. Andersen "had the opportunity to review the longitudinal record at the hearing level" and was familiar with SSA rules and regulations.[156]

Plaintiff presents three reasons as to why the ALJ erred in concluding that Dr. Andersen's opinion was persuasive.  First, Plaintiff maintains that the ALJ's statement that Dr. Andersen's opinion was consistent with the overall record was a "vague and conclusory" justification.  Second, Plaintiff asserts that the ALJ's conclusion that Dr. Andersen's opinion was persuasive because he was familiar with SSA rules and regulations was legal error since Drs. Fraser and Caldwell were also familiar with SSA rules and regulations.  Third, Plaintiff asserts that the ALJ's conclusion that Dr. Andersen's opinion was persuasive because he had reviewed Plaintiff's records "at the hearing level" was legal error because he failed to explain

---

[155] A.R. 616–22.

[156] A.R. 604.

why a hearing-level review of Plaintiff's records made Dr. Andersen's opinion more persuasive than Dr. Fraser's and Dr. Caldwell's opinions.[157]

The Commissioner disagrees, arguing that the ALJ exercised reasoned judgment in concluding that, unlike the other medical experts' opinions, Dr. Andersen's opinion was consistent with the overall record. The Commissioner reiterates that the question for the Court is "whether there is substantial evidence to support the Commissioner's actual finding,"[158] and asserts that Plaintiff is trying to have the Court impermissibly "reweigh the evidence."[159]

As with the previous medical experts, the ALJ's evaluation of the persuasiveness of Dr. Andersen's opinion was deficient. Simply stating that he found Dr. Andersen's opinion is "persuasive [because] it is consistent with the overall record" is inadequate because the ALJ did not explain this finding, nor did he identify any other medical evidence in the record with which Dr. Andersen's opinion was consistent.[160]

The ALJ also did not discuss the supportability of Dr. Andersen's opinion. The ALJ simply explained that "Dr. Andersen had the opportunity to review the

_____

[157] Docket 25 at 24.

[158] Docket 26 at 14–15 (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997)).

[159] *Id.* (quoting *Winans v. Bowen*, 853 F.2d 643, 644–45 (9th Cir. 1987)).

[160] A.R. 604.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 40 of 50

longitudinal record at the hearing level, and is familiar with Social Security rules and regulations."[161]  SSA regulations define supportability to be "[how] relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion," not the expert's familiarity with the record or SSA procedures.[162]  The ALJ's limited evaluation of the persuasiveness of Dr. Andersen's opinion failed to comply with SSA regulations. This constitutes legal error.

      f.  <u>Summary</u>

The ALJ committed legal error when evaluating the opinions of Drs. Youngblood, Feigin, Fraser, Caldwell, and Andersen.  Given that the ALJ may have formulated a different RFC for Plaintiff had he not committed these errors, the Court concludes that the ALJ's errors were not harmless and require remand.

    *5.  The ALJ's Assessment of Plaintiff's Testimony*

At the hearing, Plaintiff testified that his muscles "give out on [him]," that he "fatigue[s] easily," and that he "[has] a lot of pain" throughout his body. He also testified he has depression, as well as severe headaches and poor vision.  He

---

[161] A.R. 604.

[162] 20 C.F.R. §§ 404.1520c(c)(1) & 416.920c(c)(1).

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 41 of 50

Case 3:20-cv-00226-SLG   Document 29   Filed 02/09/22   Page 41 of 50

added that he cannot lift anything heavier than approximately 25 pounds "because . . . my wrists swell up like footballs."[163]

The ALJ discounted Plaintiff's symptom testimony when determining his residual functional capacity, finding that Plaintiff's "statements concerning the intensity, persistence and limited effects" of his fatigue and pain symptoms were "not entirely consistent with the medical evidence and other evidence in the record." The ALJ specifically concluded that "[t]he overall objective medical evidence, such as normal strength, is not consistent with [Plaintiff's] alleged severity of his limitations" on lifting, carrying, moving, handling, and fingering. He also found that Plaintiff's regular performance of activities, including "basic household chores, cooking, driving, hiking and exercising," was "not consistent with [Plaintiff's] alleged severity of his limitations."[164]

Plaintiff alleges the ALJ committed legal error in three ways. First, Plaintiff alleges that the ALJ's rejection of Plaintiff's testimony on the severity of his symptoms based on lack of objective medical evidence constituted legal error because SSA claimants "need not produce objective medical evidence of . . . pain or fatigue itself, or the severity thereof."[165] Next, Plaintiff maintains that the ALJ

_____

[163] A.R. 629–32.

[164] A.R. 601–03.

[165] Docket 25 at 25 (quoting *Smolen*, 80 F.3d at 1282).

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 42 of 50

failed to explain how Plaintiff's "normal strength" was inconsistent with his self-described symptoms of headaches, fatigue, and stress. Lastly, Plaintiff alleges that it was error for the ALJ to conclude that Plaintiff's participation in daily activities was inconsistent with his reported symptoms because such activities "do not detract from [a claimant's] credibility" if they do not "consume a substantial part of [a claimant's] day," and the ALJ made no such finding here.[166]

The Commissioner responds that the ALJ did not "arbitrarily discredit" Plaintiff's testimony. The Commissioner points to the ALJ's reliance on several examples in the record where Plaintiff's symptoms improved with conservative treatment. The Commissioner also asserts that the ALJ reasonably relied on Plaintiff's participation in activities like hiking and automotive to discredit Plaintiff's testimony on the severity of his symptoms.[167]

ALJs use a two-step process to evaluate claimants' testimony about their symptoms.[168] First, the ALJ must determine whether the claimant has shown "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[169]

---

[166] *Id.* (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)). Plaintiff's brief erroneously attributes this quotation to *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

[167] Docket 26 at 3–5 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc)).

[168] *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).

[169] *Id.* (quoting *Garrison*, 759 F.3d at 1014–15).

Second, if the claimant satisfies step one and there is no evidence of malingering, the ALJ can only reject or discredit a claimant's symptom testimony by providing "specific, clear and convincing reasons for doing so."[170] This "clear and convincing" standard is "the most demanding required in Social Security cases."[171] It is "not an easy requirement to meet," and cannot be satisfied by merely "recit[ing] boilerplate language."[172]

One valid basis on which an ALJ may reject a claimant's subjective testimony is when it contradicts the medical record.[173] Additionally, "an unexplained, or inadequately explained, failure to . . . follow a prescribed course of treatment" may undermine a claimant's subjective testimony.[174] But an ALJ "may not disregard [a claimant's testimony] solely because it is not substantiated affirmatively by objective medical evidence."[175]

Plaintiff's first argument, that the ALJ rejected his testimony for lack of objective medical evidence on the severity of his pain and fatigue, is unavailing.

---

[170] *Id.*

[171] *Garrison,* 759 F.3d at 1015.

[172] *Trevizo,* 871 F.3d at 678–79.

[173] *Carmickle*, 533 F.3d at 1161.

[174] *Trevizo*, 871 F.3d at 679 (alteration in original) (quoting *Fair*, 885 F.2d at 603).

[175] *Id.* (alteration in original) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)).

The ALJ did not reject Plaintiff's testimony on his pain and fatigue for a lack of objective evidence. On the contrary, he found that "[Plaintiff]'s medically determinable impairments could reasonably be expected to cause some of [Plaintiff's] alleged symptoms," apparently resolving step one of the inquiry in Plaintiff's favor. The ALJ rejected Plaintiff's testimony because he found it "not entirely consistent with the medical evidence and other evidence in the record."[176] While lack of evidence is not a valid basis on which to discount a claimant's subjective testimony, inconsistency with other medical evidence is. Therefore, the ALJ's decision did not erroneously reject Plaintiff's testimony for lack of evidence.

But regarding Plaintiff's second and third arguments, the Court concludes that the ALJ *did* err by failing to give clear and convincing reasons for rejecting Plaintiff's testimony. The ALJ's decision contains a thorough discussion of the evidence regarding Plaintiff's wrist and neck impairments and describes how the record showed only mild issues that had responded well to treatment.[177] But Plaintiff's testimony was not limited only to his neck and wrist pain. Plaintiff also testified that his "muscles give out on [him]," that he "fatigued easily," and that he was "in a lot of pain . . . through his body."[178] The ALJ's decision does not specify

_____

[176] A.R. 602.

[177] A.R. 602–03.

[178] A.R. 629–30.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 45 of 50

whether he found these reported symptoms reasonably attributable to Plaintiff's medically determinable impairments.[179]  The decision does list perceived inconsistencies with the record, however, which implies that the ALJ found them supported at the first step of the inquiry and therefore found them necessary to address at the second step.[180]  Accordingly, the ALJ needed "specific, clear and convincing" reasons to find Plaintiff's testimony inconsistent with the medical evidence.[181]

Regarding Plaintiff's testimony that his muscles "give out on him" and that he fatigued easily, the ALJ observed that at two neurological exams, Plaintiff had "normal strength" and "good strength throughout."  At the second exam, Plaintiff was observed to have "a normal gait."[182]  But both exams occurred in the aftermath of two episodes that Plaintiff feared had been partial seizures, and their observations were made in the neurological context.  The exams indicated a lack of immediate neurological dysfunction in the course of ruling out seizures, which is of little relevance to Plaintiff's testimony that he fatigues easily and his muscles "give out on him" in the occupational context.  Viewed in context, the exams'

---

[179] A.R. 602 (finding that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but failing to specify which ones).

[180] *See* A.R. 602–03.

[181] *Trevizo*, 871 F.3d at 678 (quoting *Garrison*, 759 F.3d at 1014–15).

[182] A.R. 603.

observations do not constitute clear and convincing reasons to support the ALJ's determination that Plaintiff's testimony regarding his muscle fatigue was not credible.

Plaintiff also challenges the ALJ's determination that Plaintiff's testimony on the severity of his limitations was inconsistent with his activities that included "performing basic household chores, cooking, driving, [and] hiking and exercising."[183]  But as Plaintiff correctly points out, a social security claimant's participation in certain daily activities "such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability."[184]  The Ninth Circuit has explained, "[a] patient may do these activities *despite* pain for therapeutic reasons, but that does not mean [he] could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved."[185]  Factual findings on a claimant's daily activities may be sufficient to discredit his allegations only if the claimant "is able to spend a *substantial* part of [his] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting."[186]  Hence, Plaintiff's

---

[183] A.R. 603.

[184] *Vertigan*, 260 F.3d at 1050.

[185] *Id.* (emphasis in original).

[186] *Id.* at 1049 (emphasis in original) (quoting *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999)).

participation in household activities and occasional hobby work, such as "tinkering with his car," did not constitute a clear and convincing reason to reject his testimony on the severity of his limitations.

In sum, although the ALJ did not erroneously discredit Plaintiff's testimony for lack of objective evidence, he did err in failing to provide clear and convincing reasons for discrediting Plaintiff's testimony on the severity of his limitations. Given that the ALJ may have reached a different conclusion on Plaintiff's RFC had he not discredited that testimony, the ALJ's error on this point was not harmless and requires remand.

### 6. Whether Plaintiff's New Evidence Undermines the ALJ's Decision

Plaintiff submitted 564 pages of additional medical records as new evidence in his request for review to the Appeals Council. In denying the request, the Appeals Council concluded that Plaintiff's new evidence "does not show a reasonable probability that it would change the outcome of the [ALJ's] decision."[187]

Plaintiff alleges that the new evidence "undermines the ALJ's decision" in several respects. But because the Court has already reversed the ALJ's decision on those points, the Court needs not reach Plaintiff's allegations regarding the additional evidence. On remand, the ALJ shall consider the additional evidence.

---

[187] A.R. 2.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 48 of 50

## V. CONCLUSION AND SCOPE OF REMAND

After reviewing the ALJ's decision, the administrative record, and the parties' briefs, the Court has reached the following conclusions: First, the ALJ erred in determining that Plaintiff's past relevant work was the occupation "Medical Assistant," *DOT* 079-362.010, as that occupation is generally performed in the national economy. Second, the ALJ failed to fulfill his duty to develop the record regarding the discrepancies in the vocational expert's testimony about Plaintiff's work history and the evidence of Plaintiff's fibromyalgia. Third, the ALJ erred in his analysis of Plaintiff's cavernoma and headaches, but did not err in determining that Plaintiff's neurocognitive disorder was not a severe medically determinable mental impairment. Fourth, the ALJ erred in his evaluation of the persuasiveness of the medical opinions of Drs. Youngblood, Feigin, Fraser, Caldwell, and Andersen by failing to adequately address the supportability and/or consistency of their opinions. Fifth, the ALJ erred in rejecting Plaintiff's testimony on the severity of his symptoms by failing to provide the requisite "specific, clear and convincing reasons for doing so."[188]

Because essential factual issues remain unresolved, the Court concludes that the proper remedy in this case is reversal and remand for further

---

[188] *Trevizo*, 871 F.3d at 678.

Case No. 3:20-cv-00226-SLG, *Scott H. v. Kijakazi*
Decision and Order
Page 49 of 50

administrative proceedings consistent with this decision, including a new hearing and the issuance of a new decision.[189]

## VI.    ORDER

Having reviewed the administrative record, the Court concludes that the ALJ's decision and findings are not supported by substantial evidence and are not free from legal error.  Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 25 is GRANTED, and this matter is REMANDED for further proceedings consistent with this order.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 9th day of February, 2022, at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

---

[189] *See Garrison*, 759 F.3d at 1019–20.